UNITED STATES *v.* DURATEX STENCIL Co. (No. 3477)[1]

United States Court of Customs and Patent Appeals, February 1, 1932

*Charles D. Lawrence*, Assistant Attorney General (*Peter A. Abeles* and *Ralph Folks*, special attorneys), for the United States.
*Walden & Webster* (*J. L. Klingaman* of counsel) for appellee.

[Oral argument December 9, 1931, by Mr. Folks and Mr. Klingaman]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court.

Merchandise, consisting of stencil paper, was assessed for duty by the collector at the port of New York as paper, not specially provided for, at 30 per centum ad valorem under paragraph 1309 of the Tariff Act of 1922, which reads as follows:

PAR. 1309. Jacquard designs on ruled paper, or cut on Jacquard cards, and parts of such designs, 35 per centum ad valorem; hanging paper, not printed, lithographed, dyed, or colored, 10 per centum ad valorem; printed, lithographed, dyed, or colored, 1½ cents per pound and 20 per centum ad valorem; wrapping

---

[1] T. D. 45499.

paper not specially provided for, 30 per centum ad valorem; blotting paper, 30 per centum ad valorem; filtering paper, 5 cents per pound and 15 per centum ad valorem; paper not specially provided for, 30 per centum ad valorem.

The importer protested, claiming that the imported paper was dutiable at 5 cents per pound and 15 per centum ad valorem as "Papers with coated surface or surfaces, not specially provided for," under paragraph 1305 of that act. Although various claims were made in the protest, counsel for appellee concedes in this court that, if the merchandise is not dutiable under the quoted provisions of paragraph 1305, it is dutiable, as assessed by the collector, under paragraph 1309.

On the trial below, William W. Erskine, a representative of Messrs. Greif-Werke, Germany, shippers of the involved merchandise, testified for the importer. He stated that, for a period of approximately one week, he had personally observed the process by which merchandise similar to that here involved was manufactured, and had become familiar with such process. With regard thereto, he said that large sheets of white yoshino paper—a thin, light-weight, porous, and absorbent paper, represented by illustrative Exhibit C—were drawn over a cylinder, the lower portion of which revolved in a liquid, and were then hung to dry in a room having a different temperature.

The witness was unable to state the nature of the liquid through which the cylinder revolved, nor did he testify as to its purpose, except to say that its application to the yoshino paper was essential in the manufacture of stencil paper.

With regard to the use of the involved merchandise, he stated that after the sheets were dry they were cut to size and used only for—

reproduction purposes for typeing [typing], in the first place or drawing. They are placed upon a revolving duplicating machine and used for reproduction on paper.

The witness, Sigmund Gestetner, chairman and managing director of Gestetner (Ltd.), London, England, manufacturers of duplicating machines, stencil paper, and stencil ink, testified for the importer. He stated that Messrs. Greif-Werke, Germany, manufacturers and shippers of the involved merchandise, operate under a license granted by Gestetner (Ltd.). With reference to the application of the solution to the yoshino paper he said that "it is absolutely essential not to have the composition on both sides." Continuing, he said—

Cross-examination by Mr. ABELES:

X Q. Does any of the solution go through the yoshino paper?—A. If it does, the paper——

X Q. Does it? Yes or no?—A. *In the manufacture of the paper it could, but the resultant sheet would not be a stencil, because if it did go through it would not be stencilized satisfactorily.*

X Q. Please try to answer my question. Does it go through?—A. If these sheets——

Justice FISCHER. *Does the solution penetrate, go through, the paper?*

The WITNESS. *It goes into the paper, because the paper is absorbent to a certain extent.*

By Mr. ABELES:

X Q. *Well, does it go through?*—A. *It enters the fibers.*

Justice FISCHER. *Does it go through onto the other side?*

The WITNESS. *It doesn't go through, as would a defective sheet.*

Justice FISCHER. *It doesn't go through?*

The WITNESS. *No; absolutely not.*

By Mr. ABELES:

X Q. *What if it goes through?*—A. *If it goes through it can't be used for a stencil.*

Justice FISCHER. Well, that is a different answer.   *Can it be used for stenciling if the substance penetrates and goes through to the other side?*

The WITNESS. *No.*

By Mr. ABELES:

X Q. Is it a fact that what you try to do is to keep it on one side, but in actual practice the solution does go through the paper?—A. *Oh, no; because the chemical solution is so adjusted that it can't go through; actual chemicals are put into the solution to prevent it being soaked by the fibers of the paper through, because this is a very absorbent paper and if you were to use any kind of a solution*——

X Q. Meaning what exhibit?—A. Exhibit C.

X Q. Yes.   Go ahead.   Have you finished?—A. (Continuing)   *It would just be soaked up by the fibers.*

X Q. The solution that is used in the manufacture of this paper is not soaked up by the fibers?—A. It is soaked up to a minimum extent.

X Q. And when it is soaked up by the fibers, then the solution would penetrate through the paper?—A. If sufficient were soaked up.   (Italics ours.)

The witness was then requested by counsel for the Government to scrape the side of the paper that did not come in contact with the cylinder for the purpose of ascertaining whether the solution was absorbed by the yoshino paper and appeared on both sides.   After complying with that request, the witness said—

A. I told you that I am perfectly willing to admit that you can get the composition from either side by scraping with a knife, but you get more from one side than you do from the other.

X Q. Now, if the composition can be scraped off of the reverse side, the side that is not in contact with the roller, is it proper to infer that the solution has gone through the paper?—A. Some has.

He stated, however, that, although there was nothing to prevent the solution, which was about the consistency of molasses or heavy gear oil, from being deposited on both sides, the yoshino paper was not impregnated nor saturated with it.

The Government called two witnesses, one, Isidore Schnopper, a Government chemist, and the other, Wm. George D. Orr, secretary and assistant to the president of the A. B. Dick Co., Chicago, manufacturers of mimeographs and supplies therefor, including stencil paper and ink.

The witness Schnopper stated that, in the regular course of his duties, he was requested by the Assistant Attorney General to make

a chemical analysis of the component materials of the involved paper in order to determine its "ink proofness and grease proofness," and whether or not it was a coated paper. With reference to his activities in this regard, he said that he first removed the material applied to the yoshino paper by means of solvents and thus was able to, and did, determine that the imported merchandise was composed of about 22½ per centum of yoshino paper, represented by illustrative Exhibit C, about 10 per centum cellulose ester, and 67½ per centum of oleic acid; that his examination disclosed that the yoshino paper, cellulose ester, and oleic acid had been mixed, that is, incorporated with each other within the common meaning of the word "incorporation," which, according to the witness, "means a mixing, blending." He then said—

The cellulose ester and the oleic acid have been absorbed by that paper, and they are there in the form of a—well, more or less solid. Oleic acid is liquid, but when dissolved and the solvents evaporated off it leaves it somewhat solid, which is particularly inside these ratio-like openings in this paper.

The witness further stated that the solution applied to the yoshino paper, which was very porous, had penetrated through it, and that there was about as much on one side as on the other. Continuing his testimony, he said:

A. * * * I took a piece of this paper as represented by illustrative Exhibit C and placed underneath it a piece of ordinary laboratory filler paper, and I put that over a glass, supported or hung about three or four inches above the filler, and I dropped the contents of the oleic acid on this paper and could see that the oleic acid immediately came through and showed on the filler. Also, I could see that the oleic acid had spread and only spread a certain distance; I put a drop of oleic acid on that exact spot and I could see that it spread some more for only a certain distance. From that I concluded that as long as there is oleic acid in excess it will spread, and until there is no more excess of oleic acid and then the spreading will stop.

Q. That drop of oleic acid that you put there, did that saturate the particular part in contact?—A. Yes; it did.

Q. How did you determine that, that it saturated at this point?—A. By the fact that I dropped another drop of oleic acid and the oil spread to a larger area, showing that that particular spot could not take up any more oleic acid.

On cross-examination he stated that he scraped the imported paper and that the material scraped from each side consisted of a mixture of fibers, cellulose ester, oleic acid, and a small amount of dye.

The witness Orr testified that from almost daily observation in his factory, he had become familiar with the process of manufacture of merchandise like that involved. With regard thereto, he said—

A. We have two processes of manufacturing the commodity. One, we take the sheet of yoshino paper, which has been marked "Exhibit C," and we have a small pan, just a little larger than the sheet, filled with the stencil coating solution, and we lay the sheet on top of the solution until the solution soaks through to the other side. Then we draw it over a wire to wipe off any excess there may be.

The other method is to do it over a roller. Where we do it over a roller the sheets are fed into the machine and they strike the roller while held between the clips, and the roller is revolving in a tank filled with the solution and it revolves at exactly the—the speed of the roller is exactly the same speed at which the sheet is traveling, and those speeds are predetermined so that the sheet will lay on the roller long enough for the solution to soak through the sheet of the yoshino paper. In both cases it is then hung up for the solvents to evaporate and leave the stencil coating necessary in the sheet.

\*       \*       \*       \*       \*       \*       \*

Q. What is the purpose of the use of the yoshino paper in connection with this solution?—A. Well, the purpose really is the fibers in the yoshino paper to hold the center of the loop letters when the sheet is stencilized on the typewriter. The solution also, you can take some of the solution and pour it out on a piece of glass or steel and after the solvents have evaporated, can pick it up, but it will be short, and if you could possibly get it into the typewriter in that condition, when you hit it with the type it would punch out just like the conductors punch a punch hole in a ticket, whereas when you have that solution in this paper these fibers are not cut by the action of typeing [typing] the stencil; it merely separates or depresses the stencil face and the fibers hold the center of the loop letters, like "O" and "Q," in place. Otherwise they would drop out and when you make your print you have just a black spot there.

He further said that the solution soaked through and saturated the yoshino paper; that, if it did not do so, the product could not be used as stencil paper; that the yoshino paper answered the same purpose in the finished stencil sheet "as hair does in plaster \* \* \* to hold the stencil mass together"; and that the involved paper was used in mimeography. The witness described at length the process by which the involved paper is made into a mimeograph sheet. He stated that the stencil sheets are placed in a typewriter, the ribbon having first been removed, and that the impact of the type spreads the solution in the paper, permitting the ink, in the mimeographing process, to pass through and form the letters.

On this record the court below held that, if in applying the solution, the yoshino paper became more or less saturated, that result was unintentional and not an essential part of the process; that it appeared from the evidence that the imported paper had coated surface or surfaces, and, on the authority of the decisions of this court in *American Express Co. et al.* v. *United States*, 2 Ct. Cust. Appls. 459, T. D. 32207, and *Knauth, Nachod & Kuhne et al.* v. *United States*, 4 Ct. Cust. Appls. 11, T. D. 33199, sustained the protest.

It is argued by counsel for appellant that the provision in paragraph 1305 for "Papers with coated surface or surfaces" must be construed in the light of the common meaning of the words therein employed; that the language "coated surface or surfaces" was intended by the Congress to mean the placing of a layer of any substance *over* a surface; that it was the purpose of the manufacturers of the involved merchandise to thoroughly saturate and impregnate the yoshino paper with the liquid solution applied thereto; and that the involved mer-

chandise is so saturated and impregnated, and, therefore, does not have a coated surface or surfaces within the meaning of the statutory provision in question.

Counsel for appellee contends that the yoshino paper was not saturated and impregnated; that, basing its contention upon the decision in the case of *American Express Co.* v. *United States, supra,* even if it should be held that it was saturated with the so-called coating solution, that fact is immaterial, if the paper has a coated surface or surfaces as a result of the saturating process; and that, therefore, the judgment of the court below should be affirmed.

In the case of *American Express Co.,* this court had under consideration the purpose and effect of a change of the language "surface-coated papers," contained in paragraph 398 of the act of 1897, to that of "Papers with coated surface or surfaces," contained in paragraph 411 of the act of 1909, and held that the Congress evidently intended to provide that "all papers which in fact possess a coated surface or surfaces should be, unless otherwise provided for, assessed under paragraph 411," and that whether paper had or had not a coated surface or surfaces was a question of fact to be determined in each case upon the evidence, regardless of the character of the paper or "the manner in which or the purpose for which such coated surface or surfaces are imparted to the paper."

In the case of *Knauth, Nachod & Kuhne et al., supra,* this court held that "windowphanie paper," intended to be applied to glass windowpanes to give them the appearance of stained glass, was not paper with coated surface or surfaces under paragraph 411 of the Tariff Act of 1909.

It appeared in that case that the "windowphanie paper" was manufactured in the following manner: Plain white opaque paper was first put through a—

printing press having a number of rollers, each one of which impresses a separate color upon its surface, so that finally a finished design in divers colors is printed upon the article.

Thereafter, it was saturated with a solution of linseed oil for the purpose of changing it from an opaque to a translucent condition. No varnish or other substance was added to either surface of the article.

In its decision the court quoted the following definitions of the word "coat";

Murray's Dictionary:

Coat. v. 2. To cover with a surface layer or coating (or with successive layers) of any substance, as paint, tar, tin foil, etc.; also predicated of the substance covering the surface.

Standard Dictionary:

Coat. v. t. 1. To cover or spread over with a surface layer, as of paint, tar, etc. 2. To cover with or as with a coat.

Century Dictionary:

Coat. n. 8.    A thin layer of a substance covering a surface; a coating; as a coat of paint, pitch, or varnish; a coat of tin foil.

Coat. v. t. 2.    To overspread with a coating or layer of another substance; as, to *coat* something with wax or tin foil.

The court then said—

\* \* \* But the result reached is simply a saturation of the article such as might less efficiently be accomplished by immersing it in a bath of the same liquid.    This fact marks the difference between the process just described and the mere painting of the exterior of an article.    In the latter case the purpose would be to reach the surface of the article only, and if the paint found its way beneath the surface that result would be unintentional and would not be an essential part of the process.

These considerations lead the court to conclude that the merchandise at bar has not a coated surface, and therefore is not within the classification adopted by the collector.

The decision in the case of *American Express Co.* v. *United States, supra,* should be considered in the light of the precise issues before the court.    It was there argued by counsel for the importer that the provision for "Papers with a coated surface or surfaces," contained in paragraph 411 of the Tariff Act of 1909, was intended by the Congress to have the same meaning as the language "surface-coated papers," contained in paragraph 398 of the Tariff Act of 1897.    The court did not adopt this view but, on the contrary, held that the purpose of the Congress in changing the language "surface-coated papers" to "Papers with a coated surface or surfaces," was evidently to avoid in the future—

the various refinements of reasoning and consideration of trade practices and usages which appear to be involved in some of the cases referred to and leave it a simple question of fact to be determined in each case upon the evidence whether the paper has or has not a coated surface or surfaces, regardless of the character thereof, and the manner in which or the purposes for which such coated surface or surfaces are imparted to the paper.

After a consideration of the definitions quoted and the language of the court in its decision in the case of *Knauth, Nachod & Kuhne, supra,* it is evident that the court did not intend to be understood as holding, in the *American Express Co.* case, *supra,* that a saturated paper was a paper with a "coated surface or surfaces" within the statutory meaning of those words.

In the *Knauth, Nachod & Kuhne* case the court held that the word "coat" meant to cover with a surface layer or coating, and stated, in substance, that, in a "coating process"—

the purpose would be to reach the surface of the article only, and if the paint found its way beneath the surface that result would be *unintentional* and would not be an *essential part* of the process.    (Italic ours.)

We think it is perfectly obvious from the evidence in this case that it was the purpose of the manufacturers of the involved paper to thoroughly impregnate the yoshino paper with a so-called coating solution. In this connection it may be pointed out that the witness Sigmund Gestetner, who testified for appellee, stated positively that it was the purpose of the manufacturer to prevent the solution going through the paper; that "it is absolutely essential not to have the composition on both sides"; that if it did go through "the resultant sheet would not be stencil, because if it did go through it would not be stencilized satisfactorily," but would be defective. Nevertheless, on cross-examination, after he had tested the involved paper by scraping its surfaces, he admitted that the solution applied to the yoshino paper did go through and was on both sides of it. He did not suggest that the imported paper was defective. We find it impossible to reconcile his testimony in this regard. Furthermore, the witness Schnopper, a Government chemist, testifying for the Government, stated that the solution had been absorbed by the yoshino paper and that, by scraping the surfaces of the imported paper, he obtained a thorough mixture of the fibers of the yoshino paper and the solution applied to it.

The Government's witness Orr testified that the solution applied to yoshino paper was intended to soak through and impregnate it and that, if it did not do so, the resultant product could not be used as stencil paper.

We are of opinion, therefore, that the decision of the trial court holding that, if in applying the solution, the yoshino paper became more or less saturated, that result was unintentional and not an essential part of the process, is contrary to the weight of the evidence.

It clearly appears from the record that the so-called coating solution was distributed throughout the yoshino paper, the solution and the paper being mixed, incorporated with each other, and that it performed substantially the same function in the body as it did on the surfaces. This being so, and as there was no additional coating applied to the surface or surfaces, it is not paper with "coated surface or surfaces" within the purview of paragraph 1305. *Knauth, Nachod & Kuhne* v. *United States, supra.*

For the reasons stated, the judgment is *reversed.*